1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,      )
                             )
vs.                            )
                             )
DAVID JOHNSON,         )
                             )
            Defendant.    )
_____ )

Case No.  2:12-cr-00067-LRH-GWF

**FINDINGS &
RECOMMENDATIONS**

**Motion to Suppress - #17**

This matter is before the Court on Defendant David Johnson's Motion to Suppress for Fourth Amendment and Fifth Amendment Violations (#17), filed on July 9, 2012.  The Government filed its Response in Opposition to Defendant's Motion to Suppress (#23) on July 26, 2012.  Defendant filed his Reply to the Government's Response to Motion to Suppress (#24) on July 30, 2012.  The Government filed its Supplement Brief on Defendant's Motion to Suppress and Reply (#33) on August 10, 2012.  The Court conducted an evidentiary hearing in this matter on August 13, 2012, September 11, 2012 and December 5, 2012.  The Court also conducted an *in camera* hearing with the confidential informant in this case on October 9, 2012.  The Defendant filed a Supplement Regarding Standing (#76) on December 12, 2012 and the Government filed its Response to Defendant's Supplemental Brief (#77) on December 18, 2012.

## FACTUAL BACKGROUND

On November 16, 2010 at approximately 2:53 A.M., Detective Chris Tucker of the Las Vegas Metropolitan Police Department ("LVMPD") applied to Clark County, Nevada Justice-of-the-Peace Nancy Oesterle for the issuance of a telephone search warrant to seize firearms and firearms related items at 203 Jefferson Avenue Apt. #2, Las Vegas, Nevada.  *Government's*

*Hearing Exhibit 11, Affidavit and Application for Search Warrant (hereinafter "Affidavit").*

Detective Tucker's affidavit stated that the apartment to be searched was in a building that contained three apartment units, the front doors of which faced west. The affidavit stated that there was a brown wrought iron fence located on the north side of the property. *Affidavit, pg. 2.*

Detective Tucker's affidavit further stated:

> That I, Detective C. Tucker, P#7175 received information from a reliable confidential informant reference narcotics sales at 203 Jefferson Avenue in Las Vegas, Nevada 89106. The C.I. stated that the indi ... the individual has a moniker of D-Boy and would be located in the second apartment from the north alley. Detectives from the GCB6 arrived at 203 Jefferson in the north alley. The apartment ... the property appeared to be abandoned. It was a fenced property. It was posted no trespassing. The gate was padlocked and chained closed. There were hanging wires from the building. No lighting on the property was observed and the only way onto the property was through a gap in the fence where the wrought iron bars had been pried off. As Detective Mendoza (M-E-N-D-O-Z-A), P#6878 and Detective J. Bonaguidi, P#7967 went through the fence and walked around the corner of the building they observed a black male exit the second apartment. At that time Detective Mendoza verbally identified himself as a police officer. When the subjects observed the detectives who were in full uniform of the day, he turned and ran back towards the apartment. Uh Detective Mendoza and Bonaguidi were right behind the subject as he attempted to shut the security gate which does not have a latch nor lock so it remained open. The subject uh then attempted to close the inside door which also does not have a ... a doorknob and remained partially open. Detective Mendoza then pushed the door open for officer safety to observe the location of the subject. The subject was standing in the doorway. The detectives then took the subject by the arm and had him exit ... had him exit.

*Affidavit, pgs. 3-4.*

Once the individual was brought outside, Detective Tucker asked him his identity and he identified himself as David Johnson. Detective Tucker asked Mr. Johnson if the apartment was his residence and Mr. Johnson stated that it was. Detective Tucker asked him about the visible power cords–as the apartment had no meter. Mr. Johnson stated that the power was coming from the next apartment, unit #1. Mr. Johnson stated that he had a lease for the apartment and that he paid $350.00 a month to stay there. The detectives asked if there was anyone else in the apartment and Mr. Johnson stated that his girlfriend was asleep inside. The detectives observed from the open door that a female was sleeping on the couch. *Id., pg. 4.* The affidavit then states:

2

Detective Mendoza also saw in plain view from the open door what was immediately recognizable to him to be the barrel enclosed in a slide of a semi-automatic handgun in an open case that was laying on the futon across from the open door.

*Affidavit, pg. 4.*

The officers conducted a records check on Mr. Johnson which revealed that he was a convicted felon.  The records check also indicated that Mr. Johnson was registered as residing at 2001 Lowery in North Las Vegas, Nevada, 89032.  *Id.*

Judge Oesterle found probable cause and issued the search warrant requested by Detective Tucker.  The officers executed the warrant and found and seized two firearms in the apartment:  a High Point C9 9mm firearm and a Colt Commander .45 Caliber firearm.  *Government's Exhibit 11, Search Warrant Return.*  Mr. Johnson was subsequently charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *See Indictment (#1).*

Defendant David Johnson has moved to suppress the evidence based on the officers' violation of the Fourth Amendment in entering the apartment and seizing him, which led to the discovery of the firearms.  Defendant also moves to suppress his pre-*Miranda* statements.  One of the issues in this matter is whether Mr. Johnson was lawfully on the premises at 203 Jefferson Avenue, Apt. #2 on November 16, 2010.  The Government contends that Mr. Johnson was a trespasser or squatter on the property and therefore did not have a legitimate expectation of privacy in the premises protected by the Fourth Amendment.  The following discussion summarizes the hearing testimony and other evidence relating to the police officers' entry onto the property, the seizure of the Defendant, and whether Defendant Johnson was lawfully on the premises.

## 1.   **Police Detectives**

Detective Chris Tucker initiated the Gang Unit's investigation at 203 Jefferson Avenue on November 15, 2010.  He was the case agent during the investigation and directed the activities of the other officers.  Detective Tucker also interviewed Defendant Johnson, applied for the search warrant and prepared the written arrest report.  *Transcript (#38), August 13, 2012 hearing, (hereinafter "TR1"),* 77:17-25.  Although the search warrant affidavit stated the investigation arose from information provided by a confidential informant regarding possible drug sales on the

property, Detective Tucker testified that he was also following up on information he had received from LVMPD Officer M. Collins, who asked him to assist in identifying a suspect in a convenience store robbery.  TR1, 43:10-44:17; 82:16-83:7; 89:2-25.  Detective Tucker stated that the confidential informant was a relatively new informant in November 2010.  TR1, 159:13-15.  He also testified that the information provided by the informant was based on what the informant had heard from others.  The officers went to 203 Jefferson Avenue in an attempt to verify that information.  TR1, 161:20-21.

Detective Tucker testified that he had worked the area of town where 203 Jefferson Avenue is located for several years and that he was familiar with the area.  TR1, 45:18-23.  Detective Scott Mendoza also testified that there was a lot of gang and drug activity in the area and it was an area that the gang unit commonly patrolled.  TR1, 193:6-10.  Detective Tucker stated that there is a house on the Jefferson Avenue side of the subject property.  The apartments were located in the rear of the property adjacent to the alley.  TR1, 47:16-21.  The front of the property on Jefferson Avenue is open such that a person can enter the property from that side without having to pass through a gate, and can walk to the back of the property where the apartment units are located.  TR1, 106:19-107:8.

Detective Tucker and his partner, Detective Hambly, arrived in the alley behind 203 Jefferson Avenue at approximately 11:30 P.M.  He testified that the property appeared to be abandoned because it was dilapidated, there were no visible lights on in the property, there were boards on the windows and there were no electrical meters on a couple of the boxes.  TR1, 47:1-11.  No automobiles were observed on the property.  TR1, 47:22-24.  There were "no-trespassing" signs posted on the property.  TR1, 50:21-24.  There was a wrought iron fence on the alley side of the property with a gate that was chained and padlocked.  There was an opening in the fence, however, where the iron bars had been pried open.  TR1, 50:21-24; 51:15-17.  *See also Government's Exhibits 2 and 4*, (photographs depicting the gate and the gap in the fence).  Other officers also testified that the property appeared to be abandoned.  *See* TR1, 192:23-24 (Detective Mendoza); and TR1, 302:19-303:1; 303:11-16 (Detective Bonaguidi).  Prior to going to 203 Jefferson Avenue, neither Detective Tucker nor other members of the Gang Unit conducted any research or

investigation regarding who owned the property, whether it had utility service, or whether it was occupied. TR1, 79:20-82:19.

Detective Tucker testified that the officers entered the property through the opening in the fence. TR1, 51:10-24. All of the officers were dressed in green fatigue uniforms. TR1, 100:15-18. Detectives Mendoza and Bonaguidi entered the property before Detective Tucker and made the initial contact with the Defendant. TR1, 52:2-22. Detective Scott Mendoza testified that he and Detective Joseph Bonaguidi initially walked to the east side of the apartment building. They then made their way around to the west side where the front doors of the apartment units are located. As Detective Mendoza turned the corner of the building, he saw an individual, who was later identified as Defendant David Johnson, exit the middle apartment unit. TR1, 197:3-11. Because it was dark and there were no lights on in the area, Detective Mendoza identified himself as a police officer. Defendant Johnson was about three to four steps outside the apartment when Mendoza announced his presence. Defendant Johnson quickly turned and reentered the apartment. TR1, 198:16-17; 200:14-17; 257:25-258:2. Defendant Johnson attempted to shut the apartment's metal security gate and the main door. However, because neither the gate nor the door had door knobs or latches, they swung back open. The door swung back open approximately six inches. TR1, 203:9-11, 21-22; TR1, 264:4-5.[1] Detective Mendoza testified:

> I then used my arm to open the door just to get a visual, being that it was a dark apartment. I noticed the subject standing immediately in front of the door. At that time, we asked him if we could – if he could come outside or step outside and talk to him, which he did.

TR1, 203:21-204:2.

Detective Mendoza acknowledged that he reached inside the apartment with his arm and grabbed the individual's arm. TR1, 259:10-22. He further stated:

---

[1]Detective Tucker testified that neither the security door nor main door had handles. Paper was stuffed into the holes where the door handles or knobs would have been. TR1, 59:23-60:2. There was a deadbolt on the door above where the door handle would be. However, the door frame was broken. TR1, 61:12-16. Detective Mendoza also testified that there was a deadbolt on the door, but the door jam was broken and the deadbolt would not have locked the door if had it been deployed. TR1, 298:14-19; 298:25-299:12. *See also Government's Exhibits 5a, 5b and 6.*

1
2

> When the door opened up, he was standing right there.  He looked at us.  I said, come on, step outside for a second.

3

> He walked toward us.  We grabbed his arm.  My partner got his other arm because we had no idea about weapons or anything like that.  My partner escorted him out, unhandcuffed, to Detective Tucker.  And I stood at the outside of the door to keep an eye on the dark apartment.

4
5

> . . .

6

> So I never entered the apartment to bring Mr. Johnson out.

7

> Q.  Except for your hand when you opened the door?

8

> A.  My hand did; yes.

9

TR1, 260:4-15.

10   Detective Joseph Bonaguidi testified:  "I saw the defendant come out of Apartment 2.

11   Detective Mendoza identified ourselves as police, and he then ran back into the apartment."  TR1,

12   303:4-6.  Detective Bonaguidi testified that the Defendant came two or three yards out from the

13   apartment before he turned and went inside.  TR1, 305:8-14.   Detective Bonaguidi further testified:

14

> Detective Mendoza then pushed the doors open to gain, for officer safety, to gain a visual inside the apartment to see who was in there, what he was doing, Mr. Johnson, what he was doing in there.

15

> . . .

16
17

> As he opened the door, Johnson was standing pretty much right at the door, not far inside the door.  He told him to come to us.  He came over.  We took hold of his hands so he couldn't reach in and grab any weapons or anything like that.  Conducted a pat down for weapons, just to clear him out of the doorway, where we don't like to stand for officer safety.

18
19

20   TR1, 305:23-306:10.

21   Detective Bonaguidi thought Defendant might be armed based on the information about

22   possible narcotics sales on the property.  TR1, 306:18-24.  In explaining why Defendant was

23   removed from the apartment, he stated:

24

> Detective Mendoza identified us as police officers and he ran back into the apartment.  And that's why we were going to detain him, to conduct our investigation to find out whether he was involved in narcotics sales, to find out whether or not he was trespassing on the property, and to find out whether or not he's possibly burglarizing this apartment or not.

25
26
27

28   TR1, 323:12-18.

6

After Defendant Johnson was removed from the apartment, Detective Tucker asked him questions to ascertain his identity and the basis for his presence on the property. TR1, 55:1-6; 307:9-11. Detective Tucker testified:

> At first, he said he lived there, that he had a lease there, that he was renting. He paid a certain amount of money a month to stay on that property.
>
> As we progressed in our conversation, it changed from actually staying in that particular apartment, to the one that was right next to it. However, he had to move out of that one because the roof had caved in, so he had to move from the first one to the second one.

TR1, 55:21-56:3.

Detective Mendoza remained at the apartment door after Defendant was removed and kept his focus on the apartment because he didn't know if anyone else was inside. TR1, 205:25-206:4. Detective Mendoza was then informed that there was a female sleeping inside the apartment. Detective Mendoza stated that he had the female step outside and she was escorted away by another detective. Detective Mendoza then aimed his flashlight inside the darkened apartment and noticed a box on the futon or couch. He observed what appeared to be the barrel of a gun sticking out from the box. TR1, 206:7-15; 222:2-16.

Detective Tucker testified that Defendant Johnson was given the *Miranda* warnings at 1:15 A.M. on November 16, 2010. TR1, 71:10-11; 74:2-11. The *Miranda* warnings were read to the Defendant by Detective Michael Hambly. TR1, 179:5-9. Detective Hambly testified that he also spoke to the woman who was in the apartment and believes he also read the *Miranda* warnings to her. TR1, 182:22-183:2. Detective Tucker testified that based on his arrest report, Defendant Johnson was placed under arrest for a prohibited person in possession of firearms at 1:15 A.M. TR1, 115:9-21. He further testified that if the officers had not observed a firearm in the apartment, they would have left without further action. TR1, 168:8-14, 175:6-9.

Detective Tucker testified that after the officers entered the apartment, they observed a hole in the wall located behind the front door of Apartment No. 2 through which electrical cords were running from Apartment No. 1. Mr. Johnson told him that after the roof caved in on Apartment No. 1, he moved into Apartment No. 2, which had no power, and they ran the electric cords into

1    Apartment No. 2 to have power.  TR1, 65:1-4, 22-25; 71:18-72:2.

2         Detective Kevin Ploense was also part of the Gang Unit team that went to 203 Jefferson

3    Avenue on November 15, 2010.  Detective Ploense testified that he worked as a patrol officer in the

4    Westside area for 10 years prior to joining the Gang Unit in 2008.  He also went to the area of 203

5    Jefferson Avenue "off and on" after joining the Gang Unit in 2008.  During the period after 2008,

6    he did not believe that 203 Jefferson Avenue was occupied.  TR1, 358:17-359:4.  Detective Ploense

7    testified that shortly before the search warrant was executed, an individual later identified as Kyle

8    Johnson, exited Apartment No. 3.  Detectives Ploense and Mendoza spoke to Kyle Johnson.  TR1,

9    351:12-17.  Kyle Johnson told Detective Ploense that he lived there and rented the apartment from

10   James Gordon. TR1, 352:3-17.  Detective Ploense asked Kyle Johnson if he had a key to open the

11   gate that was padlocked.  Kyle Johnson obtained a key and opened the gate for the officers.  TR1,

12   353:7-19.  Officer Ploense also testified that Kyle Johnson provided the officers with false

13   identification.  After determining his true identity, the officers arrested Kyle Johnson on some

14   outstanding warrants.  The officers also determined that Kyle Johnson was a convicted felon.  TR1,

15   354:7-8; 360:8-361:18.  Kyle Johnson did not provide the officers with any information about the

16   occupants of Apartment No. 2.  TR1, 359:11-360:25.

17        Detective Ploense testified that he is acquainted with the James Gordon who testified during

18   the evidentiary hearing.  He also knew of the elder James Gordon who is deceased, but apparently

19   had no contact with him.  Detective Ploense was aware that James Gordon owns several rental

20   properties on the Westside. TR1, 343:2-21.  He did not recall ever speaking to either James Gordon

21   about the property at 203 Jefferson Avenue, however, and therefore had no knowledge whether

22   they rented the apartments or permitted individuals to occupy them.  Detective Ploense

23   acknowledged that he assumed the property was unoccupied, but did not have actual knowledge of

24   its occupancy status. TR1, 363:16-365:20.  Detective Ploense testified that he did not contact James

25   Gordon to determine if Kyle Johnson or Defendant David Johnson had a right to be on the property.

26   TR1, 365:21-366:17.

27   . . .

28   . . .

8

## 2.   James Gordon

The Government called James Gordon as a witness at the evidentiary hearing.  Mr. Gordon testified that the first time he was contacted by the police, the prosecuting attorneys or anyone else regarding whether persons were residing on the subject property in November 2010 was approximately a month before the August 13, 2012 evidentiary hearing.  TR1, 37:2-24.  Mr. Gordon testified that his father, whose name was also James Gordon, owned the property at 203 Jefferson Avenue, as well as other rental properties in the "Westside" section of Las Vegas.  James Gordon testified that his father died on October 10, 2010 and had been in poor health for several months prior to that date.  TR1, 14:12-16.   His father was "kind of bedridden" and the Hospice was assisting Mr. Gordon in taking care of his father at his home.  Mr. Gordon testified that he lived with his father for approximately 10 months prior to his death.  TR1, 26:14-20.  Mr. Gordon also testified that his father began to experience dementia in the early part of 2010 which became worse as the months went by.  TR1, 15:5-17.

Mr. Gordon stated that his father owned the property, "but he had put me on there in case something were to happen to him."  TR1, 14:25-15:1.  Mr. Gordon stated, however, that he never had control of the property until after his father passed away.  TR1, 15:1-3.  After his father died, Mr. Gordon proceeded to take over the property and do what he had to do to manage it.  TR1, 14:15-20.  Mr. Gordon testified that his father's properties were vacant during this period.  TR1, 16:2-6.  Mr. Gordon testified that during the months before his father's death, the property was not being managed because neither he nor his father could take care of it.  Mr. Gordon explained:

> We own several properties.  So, in the event of me taking care of him at home, I couldn't see after the property or do anything because he was my main concern.  I'm taking care of him in the home. . . . So I couldn't see after the properties.

TR1, 16:12-17.

Mr. Gordon testified that homeless people started breaking into his father's properties during this period.  TR1, 16:18-21.  Mr. Gordon indicated, however, that such break-ins had also occurred in the past.  TR1, 17:2-6.  He assumed break-ins were also occurring in the time period preceding his father's death, but stated; "I don't really know.  I don't know."  TR1, 17:7-11.  Mr.

1  Gordon was asked if he did anything to secure the properties.  He stated that he had chained them

2  up–that if code enforcement notified him that the properties were open, he would try to take action.

3  TR1, 7:21-18:5.  Mr. Gordon testified that prior to 2010, "every, every property that we have on

4  that - - in that area if they're vacant, we try to chain them up because it's a bad break-in situation.

5  So that's all that I know."  TR1, 18:19-22.  Mr. Gordon testified that he recalled the property at 203

6  Jefferson Avenue being vacant in 2010, but he did not know how long it was vacant.  TR1, 18:23-

7  19:2.

8        Mr. Gordon testified that if the property at 203 Jefferson Avenue was leased, there would

9  have been a lease, a rental receipt, and copies of two forms of I.D. for the tenant.  TR1, 19:14-18.

10  Mr. Gordon indicated that if the property had been leased during the time his father was ill, Mr.

11  Gordon would have written the lease because his father was physically unable to do so.  TR1,

12  19:19-20:1.  He stated that no one else would have had the authority to rent out the property at 203

13  Jefferson Avenue during the period his father was ill.  TR1, 22:5-21.

14        Mr. Gordon testified on cross-examination that he did not become involved with the

15  properties until after his father died in October, 2010.  TR1, 25:5-10.  Mr. Gordon agreed that it

16  would not have been until late November or early December that he began to get his father's affairs

17  in order.  TR1, 25:15-18.  Mr. Gordon was asked whether his father kept records.  He answered:

18                Yeah, somewhat.  He, he did it –I don't know, kind of, how he did it

19                because I never could find anything to pick up where he left off.  I
              just had to kind of wing it and do it my way, so –

20  TR1, 25:20-23.

21        Mr. Gordon testified that he did not find any leases in his father's effects.  TR1, 25:24-26:1-

22  4.  He also did not find any rent receipts.  TR1, 27:4-11.  He also did not find any I.D. records for

23  renters.  TR1, 36:2-5.

24        Mr. Gordon was asked whether the apartments at 203 Jefferson Avenue had air

25  conditioning.  He testified that the apartments had A/C units in the walls.  TR1 27:22-24.  He did

26  not recall, however, when he observed A/C units in the walls and he did not know whether there

27  were A/C units in the walls in November 2010 or in 2009.  TR1, 29:2-11.  Mr. Gordon testified

28  that he believed the apartment units were rented unfurnished, but he was not sure.  TR1, 29:12-16.

1    Mr. Gordon also thought that his father employed handymen from time to time to perform work on

2    the property, but did not find any record of that.  TR1, 29:19-30:1.

3    Mr. Gordon testified that his father listed income from the rental property on his tax returns

4    prior to 2010.  TR1, 30:3-11.  He testified, however, that he did not prepare tax returns for his

5    father for the year 2010 because he did not have any records upon which to prepare a return.  TR1,

6    30:12-16.  In response to the question "So you didn't know whether or not people were paying him

7    rent or not . . .," Mr. Gordon responded: "I had no control of it."  TR1, 30:17-19.

8    Mr. Gordon testified that he had not visited the property at 203 Jefferson Avenue prior to

9    December 2010.  TR1, 33:23-34:9.  He was unaware whether electricity was being provided to 203

10   Jefferson Avenue in November 2010.  TR1, 30:25-31:8.  He has no knowledge of who "Cloe

11   Stagler" is or why she would have electricity at that apartment.  *Id.*  He testified, however, that his

12   father paid to have water supplied to all of his properties.  TR1, 31:19-32:5.

13   On redirect examination, Mr. Gordon was asked whether he had a role in managing his

14   father's properties during the period when he was sick.  Mr. Gordon answered:

15          Not really.  I would let him deal with whoever that he was dealing
            with, and kind of have his back or whatever it was.  But there was no
16          - - I didn't have control because he was kind of stiff when it come to
            dealing with the stuff, so I let him do it his way and deal with
17          whoever and let it go that way.

18   TR1, 38:16-21.

19   Mr. Gordon was asked if he would have known whether 203 Jefferson Avenue was

20   occupied from July to October 2010.  Mr. Gordon responded yes, and explained:

21          I would have had to know firsthand.  I -- if, in order for it to be like
            that, I would have had to deal with it firsthand, and I wasn't in a
22          position to deal with it, and he was not in a physical condition to deal
            with it.

23

24   TR1, 39:2-5.

25   Mr. Gordon also testified that he does not believe someone could have approached his

26   father during that time period and rented 203 Jefferson Avenue without his knowledge.  TR1,

27   39:15-19.  Mr. Gordon acknowledged, however, that if someone had rented the property from his

28   father in 2009, and was paying the rent, he would not necessarily have known of their occupancy in

11

2010 unless there was some other problem with the rental.  TR1, 40:11-25.

### 3.   **Utility Records**

Defendant subpoenaed the custodians of records for NV Energy and Republic Services, the electrical power and garbage service companies in the Las Vegas area.  *Transcript of September 11, 2012 Evidentiary Hearing (#49) ("TR2")*.  Donna LaMonte, an employee of NV Energy produced records for electrical service to 203 Jefferson Avenue.  TR2, 12:1-4.  Ms. LaMonte testified that NV Energy's records show that the customer of record for "unit one" during October-December, 2010 was Cloe Steger.  TR2, 12:11-12.  The produced records encompassed the billing cycles for October 20-November 18, 2010 and November 18-December 20, 2010.  TR2, 13:3-9.  *Defendant's Exhibit B*.  According to the NV Energy records, the service address listed on the bills was 203 Jefferson Avenue Unit 1, Las Vegas, Nevada.  The bills were addressed to Cloe Steger, 203 Jefferson Avenue Apt 2, Las Vegas, Nevada 89106.  Ms. LaMonte testified that the service address is where NV Energy physically provided the electrical service.  The second address is where the customer requested the mail to be sent.  TR2, 19:4-20.  The NV Energy bills indicate that 1,110 KWH were consumed during the October 20-November 18, 2010 billing period for a charge of $140.68.  There was no electrical consumption during the November 18-December 20, 2010 billing period.  The bills also showed an outstanding balance in excess of $1,100.00, indicating that the bill had not been paid for some time.

The Republic Services custodian of records, Carolyn Page, testified that garbage service was provided to 203 Jefferson Avenue during the months of August through December 2010.  TR2, 23:12-18.  The records list the customer as "Gordon James."  TR2, 23:17-20.  The records also indicate that the service was paid for as billed.  TR2, 23:21-25.  *Defendant's Exhibit C*.

### 4.   **Defendant David Johnson**

Defendant David Johnson testified on the issue of standing.  TR2, 50:23-25.  He stated that he did not live at 203 Jefferson Avenue, but that he spent the night there a few times.  TR2, 52:21-25.  He further stated that he had spent nights in both Apartment Nos. 1 and 2.  TR2, 53:5-6.  Defendant Johnson indicated that Tarra Harris rented Apartment No. 2.  TR2, 59:3-4.  He testified that he had known Ms. Harris for a number of years, but had been seeing or "hanging out" with her

1    for a couple of months prior to November 15, 2010.  TR2, 64:13-20.  Defendant Johnson testified

2    that on one occasion he saw Ms. Harris give money to Kyle Johnson to pay the rent on the

3    apartment.  He did not recall the amount, but stated that "it couldn't have been no more than a

4    hundred bucks, between 70 and a hundred."  TR2, 59:8-13.  He also testified that Kyle Johnson's

5    brother stayed on the property, but he did not know whether the brother paid rent.  TR2, 59:16-19.

6    Defendant Johnson also testified that Kyle Johnson never told him to leave the property.  Nor did

7    he ever see Kyle Johnson tell Tarra Harris to leave the property.  TR2, 61:16-21.

8        Defendant Johnson testified that he never saw James Gordon, Jr. on the property.  TR2,

9    61:22-24.  He testified that he knew James Gordon, Sr. prior to November 2010.  He inquired

10   about renting the property from James Gordon, Sr. in 2007 or 2008, but did not do so at that time.

11   TR2, 53:15-23.  Defendant Johnson stated that he was aware that James Gordon, Sr. rented to

12   individuals with low income and felony records on a cash basis and did not require written leases.

13   TR2, 53:24-54:8; 55:2-16.

14       Defendant Johnson testified that there was electrical power at the property in November

15   2010.  There was also cable television service. TR2, 55:24-56:6.  He also testified that there was

16   garbage service at the property and that on one occasion he helped Ms. Harris take the garbage out

17   so that it would be picked up by the garbage company.  TR2, 57:5-17.  He also testified that there

18   was water service on the property.  TR2, 60:16-25.  Defendant Johnson testified that he had

19   observed Kyle Johnson washing his car on the property on one occasion.  TR2, 61:2-5.

20       Defendant Johnson testified that Kyle Johnson "had keys to everywhere in the property."

21   TR2, 57:18-24.  This included keys to the gates and to Apartment Nos. 1 and 3.  TR2, 57:25-58: 7.

22   He also believes that Kyle Johnson probably had keys to Apartment No. 2.  TR2, 58:8-10.

23   Defendant Johnson testified that on one occasion Kyle Johnson and a "handyman" removed an old

24   toilet and replaced it with a new one.  Kyle Johnson and the other individual also took a roll of new

25   carpet into the main house on the property.  TR2, 69:11-70:5.  Defendant Johnson professed to

26   know that Kyle Johnson was paid for replacing the toilet.  TR2, 70:4-5.

27       Defendant Johnson testified that the door to Apartment No. 2 did not have a door knob, but

28   it did have a deadbolt.  He stated that Tarra Harris had a key to the deadbolt lock.  He also testified

1   that she used a chain and padlock to secure the security door when she was in at night or if she was

2   going to be gone for the day.  TR2, 58:11-21.  Defendant Johnson testified that there were electric

3   lights, and an electric stove, refrigerator, television and heater in Apartment No. 2.  TR2, 62:6-8.

4   There were also televisions, refrigerators, and stoves in Apartment Nos. 1 and 3, all of which

5   functioned.  TR2, 62:14-19.  Defendant Johnson testified that he was aware that the power to

6   Apartment No. 2 came from the electrical cords that ran into that apartment from Apartment No. 1,

7   which was Kyle Johnson's apartment.  TR2, 62:20-11. Defendant Johnson testified that Apartment

8   No. 1 was in nicer condition that Apartment No. 2.  It had a flat screen television, couch, stereo, a

9   plant, a fish tank, and a wall unit air conditioner.  It also had nicer appliances and had carpet and

10  curtains.  TR2, 64:5-12.

11      Defendant Johnson testified that on the night of his arrest, November 15-16, 2010, he saw

12  Kyle Johnson show the police around the property.  TR2, 65:2-8.  He also heard the police officers

13  ask Kyle Johnson "to go in and get his I.D."  TR2, 65:11-12.  He stated that Kyle Johnson had keys

14  for the units and the gate that night.  TR2, 65:14-16.  Defendant Johnson testified that once the

15  officers met with Kyle Johnson, they had a different attitude in terms of his or others' right to be on

16  the property.  He testified:

17          They stopped accusing us of trespassing and threatening to take us to
            jail for trespassing and all this stuff.  They were – you know, they
18          never made a mention again about any of these issues, you know, as
            far as trespassing, unlawful lodging and threatening to call in
19          enforcement and shut the building down.

20      TR2, 66:8-14.

21      Defendant Johnson testified on cross-examination that he was not aware that Kyle Johnson

22  gave the police two different names.  TR2, 76:16-18.  He testified that he was "more or less a

23  resident of the Salvation Army" in November 2010.  TR2, 74:8-17.  He stayed there when he didn't

24  have anywhere else to go.  Id.  Defendant Johnson acknowledged that he read a statement by Ms.

25  Harris in which she stated that she was visiting him at 203 Jefferson Avenue on November 15-16,

26  2010.  Defendant testified that he was surprised by that statement.  TR2, 74:23-75:4.  He also

27  acknowledged that Ms. Harris stated in her statement that Defendant Johnson was staying at the

28  apartment and that she was his prostitute.  TR2, 75:23-76:4.  Defendant Johnson acknowledged

14

that, at the time of his arrest, he had a few articles of clothing in Apartment No. 2.  TR2, 77:4-10.

### 5.   Confidential Informant

Prior to and during the evidentiary hearing, the Defendant moved for the disclosure of the identity of the confidential informant on the grounds that he has or may have knowledge relating to the alleged sale of narcotics at 203 Jefferson Avenue and whether Defendant resided there.  The Court conducted an *in camera* hearing on October 9, 2012 during which the informant was examined by the prosecutor and the Court.  The Court determined that the informant appears to have knowledge relating to Defendant's presence on the property in November 2010 and that Defendant was entitled to examine the informant under oath at the evidentiary hearing.  The Court also ordered that a transcript of the October 9, 2012 *in camera* hearing and a copy of the Police Department's file regarding the confidential informant, except for information regarding unrelated investigations, be provided to Defendant's counsel.

The informant was examined under oath by the Defendant's and Government's counsel on December 5, 2012.  The informant testified that he met the Defendant, whom he knew only by his street name "D-Boy," in 2008 when they were in prison.  The informant testified that Defendant Johnson was living or staying at the subject apartment for approximately two or three months prior to November 15, 2010.  The informant did not know the street address for the apartment.  He testified that he drew a picture or a map for Detective Tucker to show where the apartment was located.  The informant went to that location on numerous occasions to purchase crack cocaine from the Defendant which he used on the premises.  The informant also testified that illegal drugs were being sold from an adjacent apartment.  He believed the persons had been in that apartment for a year or more.  He could not identify the person(s) in the adjacent apartment, although Defendant Johnson may have referred to the person as his cousin.  The informant testified he never went inside that apartment.  The informant also described the premises as appearing dilapidated and abandoned.  He testified that there were no door knobs on the apartment's doors, but that Defendant and/or his girlfriend used chains to secure them.  The informant had no personal knowledge regarding whether Defendant was renting the apartment, was allowed to stay there by others, or was trespassing in the apartment.

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 6.    Affidavit of Kyle Johnson

During the evidentiary hearing on September 11, 2012, Defendant's counsel attempted to offer testimony by Herbert Duzant, an investigator with the Federal Public Defender's office, regarding an interview he conducted with Kyle Johnson in the Clark County, Nevada Detention Center on September 5-7, 2012.  The Government objected to Mr. Duzant's testimony on grounds of hearsay.  The Court did not permit Mr. Duzant to testify regarding Kyle Johnson's statements because the Government had no ability to cross-examine Kyle Johnson, and the Court could not assess Kyle Johnson's demeanor and credibility.  TR2, 35:10-36:21.  The Court permitted Defendant's counsel to make a proffer of Kyle Johnson's proposed testimony which was based on an affidavit that Defendant's counsel obtained from him.  TR2, 43:21-50:21.

According to Kyle Johnson's affidavit, which was read into the record, James Gordon, Jr. rented the subject apartment units to Kyle Johnson's uncle for $250.00 a month each, with the understanding that the uncle would sublease the apartments to others.  The apartment units were dilapidated and condemned, so James Gordon, Jr. could not legally rent the units on his own and used Kyle Johnson's uncle as a middleman.  Kyle Johnson stated that he resided in Apartment No. 1 in November 2009 following his release from the California Department of Corrections.  Kyle Johnson also stated that his brother resided in the apartment before he moved in.  He stated that his cousin Cloe Steger also moved into one of the apartments around the same time and they used her name on the written lease with James Gordon, Jr. to open an account with NV Energy in her name. According to Kyle Johnson, James Gordon, Jr. was fully aware of everything that took place, and he was paid by Kyle Johnson's uncle in accord with their agreement.  Kyle Johnson further testified that both he and his brother gave Tarra Harris permission to live in Apartment No. 2 and that she was staying there approximately two weeks before her boyfriend David Johnson started coming around.  Kyle Johnson stated that Defendant David Johnson stayed in Tarra's apartment overnight on various occasions, including the night of the arrest.  TR2, 46:1-50:14.

## DISCUSSION

### 1.    Alleged Fourth Amendment Violations

The Court first addresses whether the police officers' conduct violated the Fourth

16

1   Amendment–assuming that Defendant David Johnson had a reasonable expectation of privacy in

2   the premises.

3       Defendant Johnson argues that the police officers violated the Fourth Amendment when

4   they made entry onto the property through the wrought iron gate because the entire property was

5   within the curtilage protected under the Fourth Amendment.  In *United States v. Dunn*, 480 U.S.

6   292, 301, 107 S.Ct. 1134, 1139 (1987), the Supreme Court stated that the Fourth Amendment

7   protects the curtilage of the house.  "[T]he extent of the curtilage is determined by factors that bear

8   upon whether an individual reasonably may expect that the area should be treated as the home

9   itself."  The Court stated that "curtilage questions should be resolved with particular reference to

10  four factors: the proximity of the area claimed to be curtilage to the home, whether the area is

11  included within an enclosure surrounding the home, the nature of the uses to which the area is put,

12  and the steps taken by the resident to protect the area from observation by people passing by."  *See*

13  *also United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010).

14      The testimony in this case established that there is a house on the Jefferson Avenue side of

15  the property.  The apartment building is located at the rear of the property, close to the alley.

16  Although there was a wrought iron fence on the rear of the property and a gate in that fence was

17  padlocked, there was also testimony that the Jefferson Avenue side of the property is open and that

18  a person can walk from the front of the property to the rear where the apartment units are located.

19  No other evidence was presented regarding the configuration of the property or with respect to the

20  factors set forth in *Dunn*.  Defendant therefore failed to establish that the area around or in front of

21  the apartments is an area in which Defendant or other occupants of the apartments had a reasonable

22  expectation of privacy.

23      Defendant is on stronger ground in arguing that the officers' entry into the apartment, itself,

24  violated the Fourth Amendment.  The protection of the individual inside his home against

25  unwarranted government intrusion is at the core of the Fourth Amendment.  *United States v.*

26  *Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) citing *Silverman v. United States*, 365 U.S. 505, 511,

27  81 S.Ct. 679, 5 L.Ed.2d 734 (1961).  As the Supreme Court stated in *Payton v. New York*, 445 U.S.

28  573, 589-90, 100 S.Ct. 1371, 1381-82, 63 L.Ed.2d 639 (1980):

1
2
3
4
5
6

> The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms:  "The right of the people to be secure in their ... houses ... shall not be violated." ...  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

7       In *LaLonde v. County of Riverside*, 204 F.3d 947, 954-55 (9th Cir. 2000), the Ninth Circuit

8 rejected the argument that a warrantless entry into a home can be justified under the lesser standard

9 of reasonable suspicion of criminal activity:

10
11
12
13
14
15
16
17
18
19
20

> First, Supreme Court and Ninth Circuit cases unequivocally hold that probable cause is a precondition for any warrantless entry to seize a person in his home.  *See, e.g., Calabretta,* 189 F.3d at 813; *Welsh,* 466 U.S. at 749–50, 104 S.Ct. 2091.  Moreover, in an en banc decision, this court squarely rejected the proposition that *Terry* 's reduced standards can be applied to a warrantless entry to search for property within the home, even when the search involves a highly limited intrusion.  *United States v. Winsor,* 846 F.2d 1569 (9th Cir.1988) (en banc).  *Winsor* relied heavily on the fact that the home is perhaps the most sacrosanct domain and that, there, Fourth Amendment interests are at their strongest. *Id.* at 1577–78.  The same is equally true for a warrantless entry to seize a person within his home. As the Supreme Court stated in *Payton,* "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton,* 445 U.S. at 590, 100 S.Ct. 1371.  In fact, *Payton* specifically reversed the lower court opinion which had relied on the premise that a warrantless entry to seize a person within a home can be held to a lower standard than a warrantless entry to search and seizure property within a home. *See id.* at 589, 100 S.Ct. 1371 . . .

21       The Fourth Amendment's warrant requirement does not, however, preclude a probable

22 cause arrest of an individual who is voluntarily standing at or just inside the open doorway of his

23 residence.  In *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995), the court upheld the

24 warrantless arrest of a defendant who voluntarily opened his motel door to the approaching officers.

25 The court stated:  "As we read the controlling authority, the question presented in this case is not

26 decided only on the basis of whether Vaneaton was standing inside or outside the threshold of his

27 room, but whether he 'voluntarily exposed himself to warrantless arrest' by freely opening the door

28 of his motel room to the police." 49 F.3d at 1426, quoting *United States v. Johnson*, 626 F.2d 753,

757 (9th Cir. 1980). *See also United States v. Whitten*, 706 F.2d 1000, 1015 (9th Cir. 1983). In *United States v. Crapser*, 472 F.3d 1141, 1148 (9th Cir. 2007), the court extended this reasoning to the investigatory detention of a suspect based on reasonable suspicion of criminal activity. The court reiterated, however, that *Terry* does not apply *inside* a home. *See also United States v. Struckman*, 603 F.3d at 738 ("the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures"). In *United States v. Perea-Rey*, 680 F.3d 1179, 1188 (9th Cir. 2012), the court further stated that "once an attempt to initiate a consensual encounter with the occupant of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." (internal quotation marks and citation omitted.)

In this case, Detectives Mendoza and Bonaguidi testified that they observed Defendant take three or four steps out of Apartment No. 2 before Detective Mendoza announced their presence as "police." The Defendant immediately returned inside the apartment and attempted to close the apartment's security gate and door. The gate and door swung partly open, however, due to the absence of latches. Detective Mendoza then pushed the door further open to see inside and observed Defendant Johnson standing inside, near the door. Detective Mendoza instructed the Defendant to come out. The Defendant complied and the officers took him by the arms as he reached the threshold. Unlike the defendants in *Vaneaton* and *Crapser*, Defendant Johnson did not voluntarily expose himself to warrantless arrest or detention by "freely opening the door" of his apartment. On the contrary, Defendant Johnson retreated into the apartment and attempted to close himself off from the persons outside, whether or not he actually perceived them to be police officers.

The Government has not attempted to argue that the officers had probable cause to arrest Defendant Johnson prior to removing him from apartment. Because the officers lacked probable cause to arrest Defendant Johnson, the entry and seizure cannot be justified under the Fourth Amendment's exigency exception. In *United States v. Struckman*, 603 F.3d at 738, the court, quoting *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009), stated that the "exigency" exception "allows [officers] to enter a home without a warrant if they have both probable cause to

believe that a crime has been or is being committed and a reasonable belief that their entry is

'necessary to prevent ... the destruction of relevant evidence, the escape of the suspect, or some

other consequence improperly frustrating legitimate law enforcement efforts.' *United States v.*

*McConney,* 728 F.2d 1195, 1199 (9th Cir.1984) (en banc)."  The government must also show that a

warrant could not have been obtained in time.  *Id.*

### 2.  <u>Whether the Officers Reasonably Believed that the Property Was Abandoned</u>

The Government argues that the detectives did not violate the Fourth Amendment by

entering the apartment because they reasonably believed that the property was abandoned.  In

support of this argument, the Government relies on *McKenney v. Harrison*, 635 F.3d 354, 358-59

(8th Cir. 2011).  In *McKenney*, the officers went to the suspect's listed home address to execute a

misdemeanor arrest warrant.  Upon arrival, the officers concluded that the house was abandoned

and entered the house to look for squatters and to see if the suspect was present.  The officers found

the suspect and a female in an upstairs bedroom.  In holding that the officers did not violate the

Fourth Amendment, the court stated that a search of abandoned property does not implicate the

Fourth Amendment because any expectation of privacy is forfeited upon its abandonment.  The

court further stated that even though the property was not actually abandoned, the officers acted

upon a mistake of fact that was objectively reasonable.  In holding that the totality of the

circumstances supported an objectively reasonable belief by the officers that the property was

abandoned, the court cited the following facts:

> The officers found the house in disrepair, with an unkempt yard and a
> fence that was incomplete and falling apart. There were no vehicles
> parked in the driveway. No one responded when the officers knocked
> on the front door, and the back door was open three or four inches.
> Through the open door, the officers could see into the kitchen, where
> the cabinets were open and empty, the refrigerator was open, empty,
> and pulled away from the wall, and there was no furniture or personal
> effects. There were no lights on, sounds from appliances, or other
> indications that the house had electrical power.

635 F.3d at 359.

The court also held that the officers did not violate the Fourth Amendment by continuing to

search the residence once they heard an electric fan operating upstairs.  The court stated that

1    "because a reasonable officer could have concluded that the house was abandoned, a reasonable

2    officer could also have concluded that anyone in the house was a trespasser who had no privacy

3    interest under the Fourth Amendment." *Id.*

4          In *United States v. Harrison*, 689 F.3d 301 (3rd Cir. 2012), the court also held that the

5    police officers' warrantless entry into a house that appeared to be abandoned did not violate the

6    Fourth Amendment.  In so holding, the court stated:

7                    A warrantless search of property is permissible under the Fourth
                     Amendment where the owner has abandoned his reasonable
8                    expectation of privacy in that property.  *United States v. Fulani*, 368
                     F.3d 351, 354 (3rd Cir. 2004) (citing *Abel v. United States*, 362 U.S.
9                    217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)).  This determination must
                     be made from an objective viewpoint, and proof of intent to abandon
10                   must be established by clear and unequivocal evidence.  *Id.*  We look
                     at the totality of the facts and circumstances in making such a
11                   determination.  *See id.; McKenney v. Harrison*, 635 F.3d 354, 359
                     (8th Cir. 2011).  In most cases, disclaiming ownership or physically
12                   relinquishing the property is sufficient to establish abandonment.

13         689 F.3d at 306-07.

14         The house at issue in *Harrison* was, in fact, rented by the defendant who stayed in it

15   overnight once or twice a week.  The police officers testified that the exterior of the house was in a

16   state of severe disrepair.  There was trash strewn about, the lawn was overgrown with weeds, and

17   the windows were either boarded up or exposed.  The front door was left open, and the lock may

18   have been broken.  The court stated, however, these observations would not alone have been

19   sufficient to find that the officers' belief that the house was abandoned was reasonable.  The court

20   noted that boarded-up windows can cut against a finding of abandonment because it suggests that

21   an individual is taking steps to secure the property.  An always open front door, however, weighs in

22   favor of a finding of abandonment.  The court further stated:

23                   It is unreasonable to assume that a poorly maintained home is an
                     abandoned home.  A one-time look at 2114 North Franklin Street in
24                   its dilapidated condition would not justify the police entering it
                     without a warrant because a reasonably cautious officer would only
25                   assume that the person who occupied the home did not maintain it as
                     they should, not that they had clearly manifested an intent to
26                   relinquish their expectation of privacy in the house.  There simply is
                     no "trashy house exception" to the warrant requirement.

27

28         689 F.3d at 311.

21

The court stated that "[t]here may be situations where it is ambiguous to a reasonable officer whether a dilapidated house is abandoned. In such cases, the officer would need to make further inquiries into the property's status." *Id.* 689 F.3d at 311, n. 5. The court held, however, that the officers' belief that the house was abandoned was reasonable based on the observations of an officer who had made prior entries into the house:

> Specifically, Officer Matthew McCarthy knew that the inside of the house matched the rundown condition of the exterior. It was a known drug den. There were no furnishings other than a single mattress on the top floor, human waste filled the bathtub and toilets, and there was no evidence of running water or electricity. During his prior entries, Officer McCarthy observed squatters, who claimed no right to be there. The house was so dilapidated that the officers believed it was not fit for human habitation. This, combined with the exterior condition of the property, is probative evidence of abandonment.

*Id.* at 311.

The court stated that this conclusion was consistent with *McKenney* in which the officers' belief that the property was abandoned was also based on their observations of the interior of the house. This Court believes that the Ninth Circuit will adopt the standards set forth in *McKenney* and *Harrison* to determine whether a police officer has a reasonable basis for believing that a house is abandoned for purposes of the Fourth Amendment.

Detectives Tucker, Mendoza, Bonaguidi and Ploense all testified that the property appeared to be abandoned. There was no testimony, however, that any of the officers had previously gone onto the property or entered inside any of the apartment units. The detectives testified that when they arrived at the property, it was dark, there were no visible lights on in the property and there were no vehicles on the property. The officers arrived at the property at approximately 11:30 P.M., however, and it is not unusual that there would be no lights on in an inhabited residence at that time of night. Although the detectives described the apartment building as dilapidated, the evidence also shows that there was a wrought iron fence on the rear of the property and the gate in that fence was padlocked. There was, however, also a gap in the fence through which entry could be made. A window on the rear of the apartments was barred and there was a "Private Property-No-Trespassing" sign in the window. There was also a "No-Trespassing" sign on the eave of the building. Other windows on the rear of the building appear to have been boarded over.

22

1   *Government's Exhibits 1, 2, 3 and 4.*  As *Harrison* states these conditions can cut in favor of a

2   finding that the property is not abandoned.  The detectives also observed that electric meters on the

3   building were missing.  Although the security gate and door on Apartment No. 2 did not have door

4   knobs or latches, the detectives did not observe this until after they saw Defendant exit and then re-

5   enter the apartment.

6        The officers' observations, at most, gave rise to a suspicion that the property was

7   abandoned.  The officers' observations did not provide clear and unequivocal evidence that the

8   property was abandoned to justify a  warrantless entry under the standards set forth in *McKenney* or

9   *Harrison*.

10        **3.    Whether Defendant Had a Legitimate Expectation of Privacy**
             **Protected by the Fourth Amendment**

11

12        "[A] criminal defendant may invoke the protections of the Fourth Amendment only if he

13   can show that he had a *legitimate* expectation of privacy in the place searched or the item seized."

14   *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007), citing *Smith v. Maryland*, 442 U.S.

15   735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).  "This expectation is established where the

16   claimant can show: (1) a subjective expectation of privacy; and (2) an objectively reasonable

17   expectation of privacy."  *Id.*  The defendant has the burden to prove both elements.  *Id.* citing

18   *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).  The Supreme Court has also stated

19   that a "[a] subjective expectation of privacy is legitimate if it is 'one that society is prepared to

20   recognize as reasonable.'" *Minnesota v. Olson*, 495 U.S. 91, 95-96, 110 S.Ct. 1684, 1687 (1990),

21   quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430 (1978).  An overnight houseguest

22   has a legitimate expectation of privacy while in the host's home.  *Id.*

23        In *Zimmerman v. Bishop Estate*, 25 F.3d 784, 787 (9th Cir. 1994), the court held that

24   squatters have no objectively reasonable expectation of privacy where they have no legal right to

25   occupy the land and build structures on it.  The court noted that the Tenth Circuit reached the same

26   conclusion in regard to a trespasser living on federal land.  *United States v. Ruckman*, 806 F.2d

27   1471, 1472-74 (10th Cir. 1986).  *Zimmerman* further stated that the house guest of a squatter has no

28   greater right to be on the property than does the squatter.  *Id.* 25 F.3d at 787-88.  The Sixth Circuit,

in *United States v. Whitehead*, 415 F.3d 583, 588 (6th Cir. 2005), held that an individual who was staying in a dilapidated, uninhabitable house as the guest of a squatter did not have an objectively reasonable expectation of privacy in the house.  The defendant also failed to show that he was more than a casual day guest who was using the house for narcotics transactions.  Defendant therefore also did not have a legitimate expectation of privacy under *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (holding that individual who was using a house only to conduct narcotics activity and was not an overnight guest had no legitimate expectation of privacy).

Defendant argues that *Zimmerman v. Bishop Estate* is distinguishable because the guest in that case received notice that he was trespassing before he was arrested.  Defendant argues that an individual who reasonably believes he is a lawful tenant or houseguest of a lawful tenant has a legitimate expectation of privacy under the Fourth Amendment.  The district court's decision in *United States v. Martin*, 2010 WL 200012 (D.Utah 2010), supports this argument.  The court held that the defendant had a reasonable expectation of privacy in a bedroom in which he was permitted to temporarily reside, although, unbeknownst to him, the bank had commenced foreclosure proceedings and the tenants had been given notice to quit.  In *United States v. Murray*, 2010 WL 3069485 (D.Virgin Islands 2010), however, the court rejected the defendant's claim that he had a reasonable expectation of privacy in a shack built on private property.  The shack had been occupied for three or four years by another man, Aliko, who gave defendant permission to stay there.  The owner testified, however, that she did not give anyone permission to build the shack or reside on the property.  The defendant knew that Aliko did not own the property, and defendant presented no evidence that he was aware of an actual relationship between Aliko and the property owner, or that Aliko had a lease agreement or paid rent to the owner.  The nature and location of the shack also made it unlikely that the owner knew about it or had given Aliko permission to erect it.

The determination of whether Defendant Johnson had a reasonable expectation of privacy in the apartment turns chiefly on questions of credibility and the burden of proof.  Detective Tucker stated in his search warrant affidavit that Defendant told him that he had a lease for Apartment No. 2 and paid $350.00 a month to stay there.  *Government's Exhibit 11, pg. 4.*  Detective Tucker

1   testified at the evidentiary hearing that Defendant Johnson also told him that he had been staying in

2   the apartment next to Apartment No. 2 and had moved into Apartment No. 2 after the roof in the

3   other apartment caved-in.  TR1, 55:21-56:3.  Defendant Johnson testified at the hearing, however,

4   that he did not live in the apartment, but instead spent a few nights there as the guest of Tarra

5   Harris.  Defendant Johnson further testified that he had observed Tarra Harris pay rent to Kyle

6   Johnson.  Defendant Johnson denied that he told the detectives that he leased or lived in the

7   apartment.  TR2, 80:20-25.

8        The Court finds no reason to disbelieve Detective Tucker's affidavit and hearing testimony

9   that Defendant Johnson told him that he was renting the apartment.  At the time that Defendant

10  provided this information to Detective Tucker, it does not appear that the firearm in the apartment

11  had yet been discovered.  Defendant, therefore, may have had no reservation about claiming a

12  possessory interest in the apartment.  Defendant Johnson's differing statements regarding the nature

13  of his presence in the apartment diminishes the credibility of his testimony regarding his or Tarra

14  Harris's occupancy of the apartment.

15       Although the apartment building was dilapidated, the evidence shows that Apartment Nos.

16  1 and 2 were occupied by Kyle Johnson, Tarra Harris or Defendant Johnson on November 15-16,

17  2010 and may have been occupied by them for several weeks or months.  James Gordon testified

18  that he did not rent the apartments, and that his father could not have rented them during the

19  months prior to his death in October 2010.  Mr. Gordon's testimony was, however, somewhat

20  inconsistent and not completely persuasive.  He testified that rentals of the apartments would have

21  been evidenced by written leases, receipts and copies of the renter's identification.  He testified,

22  however, that he found no such records after his father's death.  Mr. Gordon maintained water and

23  garbage service for the property at 203 Jefferson Avenue, which would be consistent with

24  occupancy, although it does not necessarily prove that the apartments were rented.  It is, of course,

25  possible that James Gordon, Sr. or Jr. rented the apartments to Kyle Johnson or others

26  notwithstanding their poor condition and obvious building code violations.  It is also conceivable

27  that James Gordon may not want to admit that the apartments were rented in such condition.

28  Overall, Mr. Gordon was not a substantially more credible witness than Defendant Johnson.  He

25

1   was, however, at least as credible a witness as the Defendant.

2       The Defendant has not presented sufficient evidence to overcome Mr. Gordon's testimony

3   that the apartments were not rented to anyone in November 2010. Defendant introduced evidence

4   that NV Energy provided electricity service to the apartment(s). The NV Energy records show that

5   electricity was supplied to "203 Jefferson Ave Unit 1" and that the service was billed to "Cloe

6   Steger, 203 Jefferson Avenue Apt 2, Las Vegas, Nevada 89106." *Defendant's Exhibit B.* The

7   records also show, however, that there was a balance of $1,013.45 owing before the October 20-

8   November 18, 2010 charges were incurred. The fact that the electricity bill was not being paid,

9   diminishes it as evidence that the individuals who obtained the electrical service were lawfully

10  residing in the apartments with the consent of the property owner or his agent. The fact that

11  electricity was supplied to Apartment No. 1, and then provided to Apartment No. 2 by an extension

12  cord run through a hole in the wall, casts further doubt that electrical service was purchased by or

13  for a lawful tenant of that unit.

14      The Court must decide what, if any, weight should be given to the affidavit of Kyle

15  Johnson. Fed.R.Evid. 1101(d)(1) provides that, except for rules of privilege, the Federal Rules of

16  Evidence do not apply to the court's determination under Rule 104(a) on any preliminary issue of

17  fact governing admissibility. Rule 104(a), in turn, states that "the court must decide any

18  preliminary question about whether a witness is qualified, a privilege exists or evidence is

19  admissible. In so deciding the court is not bound by evidence rules, except those on privilege."

20      In *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988 (1974), the defendant moved to

21  suppress evidence obtained during a warrantless search of his bedroom that was allegedly

22  conducted with the consent of defendant's wife. In granting the motion to suppress, the district

23  court excluded hearsay statements made by the defendant's wife to the police which established her

24  authority to consent to the search. This included the wife's statement that she and defendant were

25  married and jointly resided in the same bedroom in her family's home. The Supreme Court held

26  that the district court erred in not admitting the officers' testimony regarding the wife's statements.

27  The Court stated:

28      . . .

There is ... much to be said for the proposition that in proceedings where the judge himself is considering the admissibility of evidence, the exclusionary rules, aside from rules of privilege should not be applicable; and the judge should receive the evidence and give it as much weight as his judgment and experience counsel.  However that may be, certainly there should be no automatic rule against the reception of hearsay evidence in such proceedings, and it seems equally clear that the trial judge should not have excluded Mrs. Graff's statements in the circumstances present here.

*Matlock*, 415 U.S. at 175, 94 S.Ct. at 995.

The Court noted that the district court was "quite satisfied" that the statements had been made and that there was nothing in the record to raise serious questions about their truthfulness. The Court also noted that there was corroboration for the wife's statements.  Under the circumstances, "there was no apparent reason for the judge to distrust the evidence and exclude Mrs. Graff's declarations from his own consideration for whatever they might be worth in resolving, one way or another, the issues raised at the suppression hearing." *Id.* 415 U.S. at 176, 94 S.Ct. at 995-96.

The circumstances relating to Kyle Johnson's declarations are substantially different.  First, Kyle Johnson's hearsay declarations were not made under circumstances that give adequate assurance as to their truthfulness.  Kyle Johnson was interviewed in jail by Defendant's counsel and investigator on September 5-7, 2012.  These interviews occurred after the initial evidentiary hearing on August 13, 2012 during which James Gordon, Jr. testified.  Kyle Johnson is reportedly a convicted felon.  The detectives also testified that he provided false identification to them on November 16, 2010 and that they arrested him on warrants once his true identity was established. Kyle Johnson was also unwilling to come to court to testify in response to the subpoena that was initially served on him.  This information does not support a belief that Kyle Johnson is a truthful individual or that he does not have reason to provide false testimony.

There are some facts that appear to corroborate Kyle Johnson's affidavit.  Detective Ploense testified that Kyle Johnson had a key to the padlock on the gate at the rear of the property and may have had a key to Apartment No. 1.  Kyle Johnson also told the detective that he rented the apartment from James Gordon.  There are, however, also inconsistencies in Kyle Johnson's affidavit.  He stated that  James Gordon could not legally rent the units in his own name because of

their poor condition, and that Mr. Gordon therefore used Kyle Johnson's uncle as a middleman to rent the apartments.  Kyle Johnson also stated, however, they used his cousin Cloe Steger's name on a written lease with James Gordon, Jr. to open an account with NV Energy in her name.  It seems unlikely that James Gordon, Jr. would have permitted his name to be used on a lease with Cloe Steger if the whole purpose of using Kyle Johnson's uncle as a middleman was to avoid Mr. Gordon directly leasing the apartment to anyone.  Neither Cloe Steger nor Kyle Johnson's uncle, who is not otherwise identified, testified at the hearing or provided affidavits to support Kyle Johnson's statements.  James Gordon denied any knowledge of Kyle Johnson or Cloe Steger during his testimony.

The Court finds that Kyle Johnson's affidavit has little or no probative value based on the substantial questions regarding his credibility, the lack of reliability in the circumstances under which his testimony was obtained, and the inconsistency in the affidavit itself.  The Government had no opportunity to cross-examine Kyle Johnson and test the validity of his assertions.  Likewise, the Court has had no opportunity to evaluate his demeanor as a witness.[2]

Even if the Court assumes that Kyle Johnson rented Apartment No. 1 from James Gordon Sr. or Jr., Defendant has failed to establish that Kyle Johnson had the authority to rent Apartment No. 2.  While the evidence shows that there was a door knob and operable deadbolt on the door to Apartment No. 1, and that electrical service was provided to that unit, the same was not true for

---

[2]Defendant's counsel also failed to show that Kyle Johnson's appearance at the evidentiary hearing could not have been obtained through exercise of reasonable diligence.  A federal court may issue a writ of habeas corpus ad testificandum at the request of the defendant to secure the appearance of a state or federal prisoner as a witness. *See* 28 U.S.C. § 2241(c)(5); *United States v. Cruz-Jiminez*, 977 F.2d 5, 99 (3rd Cir. 1992).  Mr. Duzant testified that Kyle Johnson was not willing to come to court to testify, although he was willing to discuss his knowledge with Mr. Duzant.  TR2, 35:6-9.  Mr. Duzant further testified that another investigator in his office served a subpoena on Kyle Johnson prior to the evidentiary hearing on August 13, 2012, but that Mr. Johnson was unwilling to testify in response to the subpoena.  TR2, 39:18-40:8.  Kyle Johnson was subsequently arrested on an extradition warrant and was in local custody awaiting extradition when Defendant's counsel and investigator interviewed him at the jail on September 5 and 7.  Defendant's counsel did not notify the Court of these circumstances prior to the September 11, 2012 hearing and did not request the issuance of a writ of habeas corpus ad testificandum to have Kyle Johnson brought to court to testify.  The Court therefore denied Defendant's request for an opportunity to obtain Kyle Johnson's attendance at the hearing on the grounds that it was untimely.

Apartment No. 2.  The security gate and door on Apartment No. 2 had no door knob or latch

mechanism.  Although Defendant Johnson claims that Tarra Harris used a key to lock the deadbolt,

the Detectives testified, and the photographs appear to show, that the deadbolt would not have

locked the door because the door frame was broken off.  Apartment No. 2 had electricity only

because someone had cut a hole in the wall between the apartments and had run an extension cord

into Apartment 2 from Apartment No. 1.  While this indicates that Kyle Johnson provided

electricity to Apartment No. 2, it does not reasonably indicate that he had permission from the

property owner to rent Apartment No. 2 or to allow Ms. Harris or Defendant to stay in that unit.

Defendant has not proven by a preponderance of the evidence that he or Ms. Harris were

permitted to occupy Apartment No. 2 by the property owner or his agent.  Defendant has also failed

to prove, based on the totality of the circumstances, that he had an objectively reasonable belief that

his occupancy in the apartment was lawful.  Defendant's motion to suppress the evidence based on

the Fourth Amendment should therefore be denied.

### 4. Alleged Violation of Defendant's Fifth Amendment Rights Based on Failure to Provide *Miranda* Warnings

After Defendant Johnson was removed from the apartment, he was taken to Detective

Tucker who asked him his name, date of birth and social security number.   The Defendant

answered these questions. *Government's Exhibit 11*, *Affidavit*, pg. 4.  Detective Tucker then asked

Defendant if the apartment was his residence and Defendant responded that it was.  Detective

Tucker also asked Defendant about the visible power cords because the apartment had no meter.

Defendant responded that the power was coming from the next door apartment. *Id.*  Detective

Tucker asked Defendant if he had a lease for the apartment and Defendant said yes and that he paid

$350.00 a month to stay there. *Id.*  Defendant was not given the *Miranda* warnings prior to being

asked these questions.

A suspect must be informed of his Fifth Amendment rights before custodial interrogation.

*United States v. Basher*, 629 F.3d 1161, 1166 (9th Cir. 2011).  *Basher* further states:

> Miranda warnings are required only where there has been
> such a restriction on a person's freedom as to render him ''in
> custody.''  The ''ultimate inquiry'' underlying the question of

29

1
2
3
4
5

> custody is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  To answer this question, the reviewing court looks to the totality of the circumstances that might affect how a reasonable person in that position would perceive his or her freedom to leave.
>
> *Stanley v. Schriro,* 598 F.3d 612, 618 (9th Cir.2010) (internal quotation marks, alterations, and citations omitted).

6       "Factors relevant to whether an accused is 'in custody' include the following:  (1) the

7   language used to summon the individual; (2) the extent to which the defendant is confronted with

8   evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the

9   detention; and (5) the degree of pressure applied to detain the individual."  *United States v. Brobst*,

10   558 F.3d 982, 995 (9th Cir. 2009).

11       In this case, Defendant Johnson was summoned by the detectives and physically removed

12   from the apartment by Detectives Mendoza and Bonaguidi.  He was then escorted by Detective

13   Bonaguidi to where Detective Tucker was located and the foregoing questioning occurred.  The

14   Detectives were in uniform and were armed with handguns, although they did not have their

15   weapons drawn.  It is unclear whether Defendant Johnson was in handcuffs when the questioning

16   occurred.  Here, the key factors are the language used to summon the Defendant and the degree of

17   pressure applied to detain him, as well as the physical surroundings of the interrogation.  Based on

18   the totality of the circumstances, a reasonable person in Defendant Johnson's position would not

19   have believed he was free to leave.  Defendant Johnson was therefore in custody for purposes of

20   *Miranda.*

21       For purposes of *Miranda*, "the term 'interrogation' means 'any words or actions on the part

22   of the police (other than those normally attendant to arrest and custody) that the police should know

23   are reasonably likely to elicit an incriminating response.'"  *United States v. Washington*, 462 F.3d

24   1124, 1132 (9th Cir. 2006), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682

25   (1980).  "The test is an objective one; the subjective intent of the police is relevant, but not

26   conclusive."  *Id.*  Routine gathering of background biographical information, such as identity, age,

27   and address usually do not constitute interrogation.  *Id.*

28   . . .

The court in *Washington* held that FBI agents did not interrogate the defendant when they asked him what his gang moniker was.  The record showed that agents routinely obtain gang moniker and gang affiliation information to ensure prisoner safety.  The court rejected the defendant's argument that the agents sought information regarding his gang moniker to elicit proof that he was the person known as "Rock," whom the confidential informant had advised was involved with a bank robbery.  The court stated that "[q]uestions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." *Id.* at 1133, citing *California v. Byers*, 402 U.S. 424, 432-33, 91 S.Ct. 1535 (1971).  In *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 191, 124 S.Ct. 2451, 2461 (2004), the Court also stated that asking a suspect to identify himself does not usually constitute interrogation. The Court noted, however, that "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual of a separate offense."  The petitioner in *Hiibel* was a suspect in an assault on a woman.  The court held that the officer's questions seeking defendant's identity did not violate his Fifth Amendment right against self incrimination.   The Court finds that Detective Tucker's questions relating to Defendant's identity, including his name, date of birth and social security number, did not constitute interrogation to give rise to a violation of *Miranda* and the Fifth Amendment.

The detectives went to 203 Jefferson Avenue to investigate the confidential informant's tip that an individual known as "D-Boy" was selling drugs from that location.  Detective Tucker also had information possibly tying this individual to a strong arm robbery.  Detective Bonaguidi testified that he and Detective Mendoza sought to detain Defendant, after he "ran" back into the apartment, "to conduct our investigation to find out whether he was involved in narcotics sales, to find out whether or not he was trespassing on the property, and to find out whether or not he's possibly burglarizing this apartment."

It appears that Detective Tucker's initial questioning of the Defendant regarding whether he resided in the apartment took place before Detective Mendoza observed the firearm or Detective Tucker was informed of that discovery.  As Detective Bonaguidi's testimony indicates, however,

the detectives were attempting to find out whether Defendant was involved in narcotic sales reportedly being conducted on the premises, or whether he was trespassing or possibly burglarizing the apartment. Depending on his response, Defendant's answers to the questions relating to his residency in the apartment had a reasonable likelihood of eliciting incriminating information, by either connecting him to the suspected narcotics sales or establishing that he was trespassing on the property in violation of Nevada Revised Statute (NRS) § 207.200. Because Defendant's statements relating to his residency in the apartment were obtained as a result of custodial interrogation prior to the giving of *Miranda* warnings, the Government should be precluded from introducing the statements at trial in its case-in-chief.[3]

### 5. Whether Defendant has Been Unfairly Prejudiced by Pre-Indictment Delay

In his *Reply to the Government's Response to Defendant's Motion to Suppress (#24)*, Defendant argues that the indictment should be dismissed because he has been unfairly prejudiced by pre-indictment delay. Defendant argues that as a result of the delay, favorable witnesses are no longer available, his counsel is unable to inspect the apartment in the same condition it was in on November 15-16, 2010, and his counsel is unable to adequately investigate the circumstance relating to the confidential informant's tip or Detective Tucker's other reasons for going to the property on November 15, 2010. The Government argues that Defendant has not raised the issue of pre-indictment delay in a timely filed motion to dismiss. The Government also argues that Defendant's claims are without merit.

"An indictment is rarely dismissed because delay by the prosecution rises to the level of a Fifth Amendment due process violation." *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005). In order to establish a due process violation, "a defendant must prove that he suffered actual, non-speculative prejudice from the delay, meaning proof that demonstrates exactly how the loss of evidence or witnesses was prejudicial." *Id.* citing *United States v. Doe*, 149 F.3d 945, 948 (9th Cir. 1998); *United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989). "The defendant's

---

[3]The Court is not precluded from considering Defendant's statements in assessing the credibility of his hearing testimony that he was an overnight guest of Tarra Harris. *See Harris v. New York*, 401 U. S. 222, 91 S.Ct. 643 (1971).

32

1    burden to show actual prejudice is heavy and is rarely met." *Id.*  The second part of the test applies

2    only if the defendant has demonstrated actual prejudice.  Under the second part, the delay is

3    weighed against the reasons for it.  The defendant must show that the delay "'offends those

4    fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Id.*

5    quoting citing *United States v. Doe*, 149 F.3d at 948.

6         The Defendant has clearly failed to demonstrate actual prejudice resulting from pre-

7    indictment delay.  He argues, for example, that "James Gordon III, who could testify that Kyle

8    Johnson was authorized to rent and manage the property on 203 Jefferson Avenue, is no longer

9    available because he passed away." *Reply (#24),* pgs. 7-8.  The evidence indicates, however, that

10   James Gordon, Sr.  died before the events in this case occurred.  Furthermore, according to Kyle

11   Johnson's affidavit, he rented the apartment from James Gordon, Jr.  who testified at the hearing

12   and was subject to cross-examination by Defendant's counsel.  Defendant also argued that Kyle

13   Johnson and Tarra Harris are unavailable.  As discussed above, Kyle Johnson's attendance at the

14   evidentiary hearing could probably have been obtained if Defendant had exercised reasonable

15   diligence.  Defendant has provided no information regarding the alleged unavailability of Tarra

16   Harris, or that her alleged unavailability was caused by the pre-indictment delay.  Nor has

17   Defendant shown that Tarra Harris' testimony would be favorable to him.

18        Defendant generally argues he has suffered actual prejudice because of  his counsel's

19   inability to inspect the apartment premises in the same condition that they were in on November

20   15-16, 2010.  He has not shown, however, that the premises are in a materially different condition

21   than they were in November 2010, or indicated how an inspection could have reasonably changed

22   the outcome of the motion to suppress, or the result at trial.  Mere speculation that contradictory

23   evidence would have been found during an inspection does not prove actual prejudice.

24        Finally, the Court's findings and recommendation in this matter are based on Defendant's

25   failure to establish that he had a reasonable expectation of privacy in the apartment.  But for that

26   finding, the Court would have found that the officers' entry violated the Fourth Amendment.

27   Defendant has therefore not been prejudiced by his counsel's alleged inability to adequately

28   investigate the circumstances relating to the confidential informant's tip or Detective Tucker's

other reasons for going to the property to investigate.  Defendant's arguments that the indictment should be dismissed based on pre-indictment delay are without merit and should be denied, even if they had been asserted in a timely motion to dismiss.

## CONCLUSION

Based on the foregoing, the Court concludes that the police officers' entry into the apartment, which resulted in the discovery of firearms, did not violate the Fourth Amendment because the Defendant did not have a reasonable expectation of privacy in the apartment.  The Court further finds that Detective Tucker's questions to Defendant relating to his identity did not violate his Fifth Amendment rights pursuant to *Miranda*.  The Court finds, however, that Detective Tucker's questions relating to whether Defendant resided in the apartment were obtained in violation of *Miranda* and the Government should therefore be precluded from introducing those statements at trial in its case-in-chief.

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant David Johnson's Motion to Suppress for Fourth Amendment and Fifth Amendment Violations (#17) should be **denied** in regard to Defendant's claims under the Fourth Amendment, and should be **granted**, in part, and **denied**, in part in regard to his claims under the Fifth Amendment.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order

. . .

. . .

. . .

. . .

and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 26th day of December, 2012.

GEORGE FOLEY, JR.
United States Magistrate Judge

35